IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
October 28, 2014 Session

IN RE CONSERVATORSHIP OF DESSA L. MCQUINN

Appeal from the Chancery Court for Hamilton County
No. 13-G-127     W. Frank Brown III, Chancellor

No. E2013-02790-COA-R3-CV-FILED-MARCH 30, 2015

Jacqueline D. Cameron filed a petition seeking to be named as conservator of her mother, Dessa L. McQuinn.  After a hearing, the trial court declined to appoint Cameron conservator, finding that such an appointment was against McQuinn's wishes and best interest.  Exercising the discretion provided it by Tenn. Code Ann. § 34-1-114 (Supp. 2013), the trial court ordered Cameron to pay the fees and expenses of McQuinn's appointed guardian ad litem.  The court also ordered Cameron to return all of McQuinn's personal property to her house, which property Cameron had earlier removed from McQuinn's house without authorization.  Cameron appeals.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., C.J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Jacqueline D. Cameron, Cartersville, Georgia, appellant, pro se.

No appearance by or on behalf of appellee.

**OPINION**

I.

McQuinn was admitted to Erlanger Hospital in Chattanooga on July 15, 2013 for confusion and chronic obstructive pulmonary disease (COPD).  She was transferred on July 22, 2013, from Erlanger to The Bridge, a nursing home in Monteagle (the nursing

home). Cameron filed a petition for appointment of a conservator for McQuinn on September 13, 2013. Her petition alleges as follows in pertinent part:

> Upon information and belief, [McQuinn] is in need of the appointment of a Conservator because there has been some suspicious activity by Sara Ann Ford, . . . who currently has Power of Attorney for the Respondent . . . and because of Respondent's declining health and impaired cognitive skills, she needs more assistance with all activities of daily living, and she has senile dementia; and the need to have someone help manage her financial and medical affairs.
>
> Further, your Petitioner is the Respondent's daughter, and she believes that her mother's best interests are not being met by the current Power of Attorney, that Sara Ann Ford is making statements to Respondent that are upsetting, and that your Petitioner believes that it would be in the Respondent's best interest that Sara Ann Ford be restrained from any contact with Respondent. Your Petitioner is willing and able to move back to Chattanooga, Tennessee to help her mother.
>
> As a result of the Respondent's disability, it is believed that there are circumstances such as dementia and paranoia that . . . will likely result in substantial harm to the Respondent's health, safety or welfare and therefore, an Emergency Conservator should be appointed to make any immediate decisions necessary to insure Respondent's health and safety and to preserve her assets.

Attached to the petition was the sworn examination report of Dr. Jon Cohen, who examined McQuinn on July 19, 2013. Dr. Cohen's report states that McQuinn showed impaired cognitive function and poor memory, insight and understanding. It further notes that "her paranoid delusions pose a risk to others, potentially" and "she cannot reliably follow medical recommendations." Dr. Cohen suggested that McQuinn should have a conservator appointed because of the "risk of severe health decline or death if not properly supervised." His diagnosis was senile dementia, complicated by paranoid delusions, and he stated that McQuinn was "unlikely to show any significant improvement in the foreseeable future."

In her petition, Cameron asked the trial court to appoint a guardian ad litem for McQuinn; to void the general power of attorney executed by McQuinn to Sara Ann Ford

on February 7, 2013; to issue a restraining order prohibiting Ford from having contact with McQuinn; and to appoint Cameron as conservator. On September 18, 2013, Cameron filed her affidavit alleging in pertinent part as follows:

> That [McQuinn's] health has deteriorated considerably while residing [at the nursing home], and [she] has lost much weight;
>
> That I have noticed a loss of weight from one week to another, and when I was at The Bridge Nursing Home this weekend to visit my mother, she had not been bathed, and was not eating.
>
> *    *    *
>
> That I have observed urine on the floors in the hall of the facility and have never seen any person cleaning the halls or the rooms at The Bridge when I have been there to visit.
>
> That my mother is in a very weakened state and I am afraid that she will not survive if she has to continue to stay at The Bridge Nursing Home.
>
> That my mother has told me that she is in a "prison" and wants to go back to the hospital where she was previously hospitalized.
>
> That it is my intention to move my mother by ambulance at the very first opportunity in an effort to get her the medical help that she so desperately needs but cannot do so for herself.

The trial court entered an order on September 18, 2013, appointing Cameron as emergency conservator, attorney Rebecca Woods as McQuinn's guardian ad litem, and attorney Steve Tepley as McQuinn's attorney ad litem.

On September 23, 2013, a status conference took place before the trial court. The trial court later entered an order providing in pertinent part as follows:

> [P]resent before the court for a status conference were Stephen O. Tepley, Attorney *ad litem* for Dessa L. McQuinn,

3

Mitchell Meeks, Attorney for [Cameron], Rebecca Siera Woods, Guardian *ad litem,* and Ronald Berke, long term attorney for [McQuinn] (present at the request of [McQuinn]).

Based upon the reports of the Attorney *ad litem* and the Guardian *ad litem* and statements of counsel, the court found that [McQuinn's] circumstances did not rise to the level necessitating the appointment of an emergency conservator at that time. [McQuinn's] health was stable; a valid Power of Attorney naming Sara Ford as agent was in place; and further [McQuinn] was able to communicate clearly to her attorneys that she did not want [Cameron] to serve as any form of conservator. At that time, [Cameron] was removed as Emergency [Conservator] for [McQuinn] and the Guardian *ad litem* was given medical decision-making authority.

Since September 30, 2013, there have been several incidences regarding [Cameron], including but not limited to [Cameron] failing to adhere to the request of the Guardian *ad litem* not to visit [McQuinn] until further notice resulting in [Cameron] and her guest disrupting [McQuinn's] placement at The Bridge at Monteagle Nursing Home and thus upsetting [McQuinn] causing her unnecessary stress. Further, although no wrongdoing has been found on her part, Sara Ford, the agent under the Power of Attorney, is hesitant to continue in her role due [to] the continued friction with [Cameron.] . . .

Therefore, the court finds that the circumstances have escalated to the point where an Emergency Conservator is appropriate [and] it is hereby ORDERED that

1. Petitioner Jacqueline Cameron is hereby removed as Emergency Conservator for the Respondent;

2. Petitioner Jacqueline Cameron shall relinquish the Emergency Letters of Conservatorship previously issued to her by the Court . . . Further, Petitioner will relinquish to the Clerk & Master any documents or records in her possession regarding [McQuinn's] estate or healthcare as well as the key to [McQuinn's] home, said items will then be provided [to] the successor Emergency Conservator;

3. Attorney Rebecca Siera Woods is appointed as successor Emergency Conservator for [McQuinn], subject to removal by the Court at any time[.]

On November 5, 2013, guardian ad litem/emergency conservator Woods filed her report with the trial court, stating as follows:

The Guardian *ad litem* interviewed McQuinn at The Bridge at Monteagle on Thursday, September 26, 2013. McQuinn was dressed for the day and headed out of her room to socialize with other residents upon the Guardian *ad litem's* arrival. McQuinn was able to move herself from her wheelchair back onto her bed to sit comfortably for the meeting. She was vibrant and alert, in very good spirits and able to communicate clearly and effectively.

McQuinn is very spirited, but pleasantly so, which is contrary to some of the information previously provided to the Guardian *ad litem* and stated in her medical chart regarding negative behaviors. From the investigation, the only negative behavior exhibited by McQuinn occurs after McQuinn is upset by Petitioner, McQuinn's alleged daughter, Jacqueline Cameron; and then the behavior is similar to a teenager "acting out." McQuinn does repeat her statements, and tends to drift in conversation from the specific topic at hand, but all around is able to express her opinion and let her feelings be known. Her short-term memory is not phenomenal; however, she is able to pull from her long term memory quite well.

McQuinn was able to clearly discuss the negative relationship between herself and Cameron, as well as her dislike of Cameron's acquaintance, Calvin Grey. She was able to explain why she asked Sara Ford to serve as her power of attorney, and why she did <u>not</u> want Cameron to serve in any capacity. McQuinn had only nice things to say about her placement at The Bridge at Monteagle. The Guardian *ad litem* did not observe any of the negative issues described by Cameron in her pleadings or communications with the Guardian *ad litem.*

5

(Underlining and italics in original; word "respondent" in original replaced with "McQuinn"; "petitioner" in original replaced with "Cameron.")

On November 7, 2013, a full hearing took place before the trial court at the conference room of the nursing home. On November 15, 2013, the trial court entered an order appointing Jan Cloud, an agent for the Southeast Tennessee Development District, Public Guardian for the Elderly Program, conservator for McQuinn. The trial court approved the attorney ad litem's requested fees and expenses in the amount of $5,835.60 and assessed them to McQuinn. The court approved the guardian ad litem's request for fees and expenses in the amount of $8,027.43, and assessed them to Cameron. The trial court also ordered Cameron to return all of McQuinn's personal property, which Cameron had removed from McQuinn's home and placed in a storage unit in Georgia. Cameron, acting pro se, timely filed a notice of appeal.

## II.

The issues on appeal are whether the trial court erred in ordering Cameron to pay the guardian ad litem's fees and expenses pursuant to Tenn. Code Ann. § 34-1-114, and whether the trial court erred in ordering Cameron to return McQuinn's property to her residence.[1]

## III.

Our review of this non-jury case is de novo upon the record of the proceedings below with a presumption of correctness as to the trial court's factual findings, a presumption we must honor unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d). "When the resolution of an issue depends upon the credibility of witnesses, '[t]he weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court.' " *In re Conservatorship of Tate*, No. M2010-01904-COA-R3-CV, 2011 WL 6935342 at *3 (Tenn. Ct. App. M.S., filed Dec. 29, 2011). We review the trial court's conclusions of law de novo with no presumption of correctness. *Oakes v. Oakes*, 235 S.W.3d 152, 156 (Tenn. Ct. App. 2007). Issues involving statutory construction and application are questions of law reviewed de novo. *In re Conservatorship of Thomas*, No. W2012-00349-COA-R3-CV, 2012 WL 4550961 at *2 (Tenn. Ct. App. W.S., filed Oct. 3, 2012). "'The allowance of attorney's fees is largely in the discretion of the trial court, and the appellate court will not interfere except upon a clear showing of abuse of that discretion.'" *In re Conservatorship of Lindsey*, No.

---

[1] According to Cameron's brief, McQuinn died two days after the trial court entered its final judgment. Therefore, any other potential issues pertaining to McQuinn's conservatorship are moot.

W2011-00196-COA-R3-CV, 2011 WL 4120664 at *4 (Tenn. Ct. App. W.S., filed Sept. 16, 2011) (quoting *Taylor v. Fezell*, 158 S.W.3d 352, 359 (Tenn. 2005)).

IV.

Five witnesses testified at the November 7, 2013 hearing at the nursing home: Cameron, McQuinn, McQuinn's nephew, Alphonso Pollard, and two employees of the nursing home, Eller Hall and Cheryl Green. The trial court entered a comprehensive 30-page memorandum opinion and order one week later, containing extensive findings of fact and conclusions of law. The trial court found, in pertinent part, as follows regarding McQuinn's mental and physical condition:

> The Sworn Medical certificate of Jon Cohen, M.D., a psychiatrist practicing in Chattanooga, provided the initial medical information in his Report. Dr. Cohen's certificate is considered as prima facie evidence as to Ms. McQuinn's disability and need for a conservator because the Report was not (a) contested or (b) found to be erroneous. Tennessee Code Annotated § 34-3-105(d)(Supp. 2013).
>
> Trial Exhibit 2 was a copy of medical records in Ms. McQuinn's file at The Bridge. The records were generated as a result of a request by The Bridge for an evaluation of Ms. McQuinn's "decisional capacity." Trial Exhibit 2 is a copy of a four page initial psychiatric review by Wayne Tasker and Associates. The evaluation occurred on October 8, 2013 at The Bridge. Ms. McQuinn's many diagnoses and medications were listed in the Report.
>
> On October 8, 2013, Ms. McQuinn was evidently not having a good day. She was quite confused and disoriented. However, she exhibited no paranoia. The psychiatric diagnosis was vascular dementia with delusion. Dr. Andrew L. Spitznas made several recommendations in his Report.
>
> The following is the first recommendation of four listed:
>
>> 1. Recommend to Primary Care Physician the following: P[atient] clearly lacks decisional capacity to manage meds or finances, to make medical decisions, and to independently manage

ADLs. I base this clinical judgment upon her inability to voice coherently her medical problems or a comprehension of necessary treatment. Her gross disorientation, lack of insight into her present medical problems, and grossly impaired executive function also render her unable to make informed decisions about her medical treatment, finances, or abilities to live independently. Her impaired concentration would also make it impossible for her to independently manage finances. . . .

The final witness was Ms. [Cheryl] Green, a licensed practical nurse. . . . She has worked at The Bridge for over two years and has been the nurse manager of the west wing since February 19, 2013.

Ms. Green read a long list of diagnoses that had been assigned to Ms. McQuinn, including but not limited to COPD, Asthma, Hypertension, coronary artery disease, diabetes II, hyperlipedemia, GERD, neuropathy and a history of thyroid cancer. She has also been diagnosed as having dementia with some associated paranoia. Ms. Green also read a long list of medicines to treat Ms. McQuinn's various illnesses, diseases and conditions. Most had previously been prescribed before Ms. McQuinn's admission to The Bridge. The only medicine for any mental issue was Seroquel. Supplements were added by The Bridge.

The majority of issues for Ms. McQuinn are physical and not mental. Her COPD taxes her strength. She uses oxygen as needed and receives breathing treatments. However, Ms. McQuinn does have intermittent confusion, sometimes lasting for a few minutes to hours. At times, Ms. McQuinn is very confused. Ms. McQuinn exercises choices, which are usually reasonable or rational. She can usually answer questions. She remembers staff names, rooms, and faces. Ms. Green did recite her first meeting with Ms. McQuinn. When Ms. Green entered the room, Ms. McQuinn was placing tooth paste on a round hairbrush so she could brush her teeth. One time Ms. McQuinn was walking down the hall without clothes.

. . . Ms. Cameron came on September 20, 2013 to remove Ms. McQuinn. Ms. McQuinn did not want to leave The Bridge. Ms. McQuinn made some negative comments about Ms. Cameron. Ms. McQuinn was upset. It was a wild day.

\*     \*     \*

Ms. Green testified on cross-examination that, in her opinion, Ms. McQuinn needed medical assistance 24 hours a day, 365 days a year. Ms. Green did not think one person could take care of Ms. McQuinn. She needed someone nearby at all times. Ms. McQuinn took many medications. It is necessary to give the correct medicines at the right time or Ms. McQuinn could be harmed. Persons at Erlanger Hospital also told Ms. Cameron that Ms. McQuinn needed 24x7 assistance when she was there in July of 2013.

Ms. Green agreed with the doctors that Ms. McQuinn's dementia (and paranoia or paranoid ideation) did affect her ability to make major decision[s] even though, emotionally, Ms. McQuinn knows what she feels and what she wants. Ms. Green explained that Ms. McQuinn was very emotional when she was placed at The Bridge. She initially did not have a good rapport with the staff or anyone. However, over time, Ms. McQuinn has developed trust and made friends. Ms. McQuinn is strong-willed and still thinks she can do many of the things she used to do. She does not understand her physical limitations.

The court finds that Ms. McQuinn is partially disabled due to her dementia with paranoia. She also has significant physical limitations and medical conditions.

\*     \*     \*

The guardian ad litem recommended an independent conservator, not Ms. Ford or Ms. Cameron. Therefore, the court finds that Ms. McQuinn does need a conservator appointed to assist and protect her.

As already stated, the trial court appointed an agent of the Southeast Tennessee Development District, Public Guardian for the Elderly Program as conservator. The trial court agreed with Cameron's position that "this case is not financially suitable for the appointment of an attorney as conservator." The court explained its decision not to appoint Cameron as conservator as follows in pertinent part:

> First, Ms. McQuinn does not want Ms. Cameron to be her conservator. Ms. McQuinn made that fact abundantly clear during the hearing on November 7, 2013. She had also earlier made the same statements to Ms. Green, Ms. Hall, Ms. Woods, the guardian ad litem, and Mr. Tepley, the attorney ad litem. Ms. McQuinn still has much of her mental faculties and her wishes should be given weight and consideration.
>
> Second, both Ms. Green and Ms. Hall testified that Ms. McQuinn was visibly upset when Ms. Cameron visited her at The Bridge. She even "acted out" the next day or so after such visits. It was also mentioned that Ms. McQuinn was having nausea and upset stomach during the time Ms. Cameron was trying to remove Ms. McQuinn from The Bridge and at other visits. Ms. McQuinn lost weight. The same thing occurred prior to the hearing on November 7, 2013. The evidence is that the strained relationship between Ms. Cameron and Ms. McQuinn results in changes in Ms. McQuinn's physical and mental conditions. Thus, Ms. Cameron's appointment could worsen Ms. McQuinn's condition.
>
> Third, Ms. McQuinn had stated to others that Ms. Cameron just wanted her stuff. At the hearing, Ms. McQuinn testified that some of Ms. Cameron's friends wanted her art collection. Ms. Cameron did get her stuff, or at least most of it. Ms. Cameron admitted she took most of the household goods, furniture, appliances and art collection on October 13, 2013. Ms. McQuinn was said to have had some really nice furniture and furnishings. Ms. Cameron had been removed as Emergency Conservator and knew of such before she removed the household goods and furnishings. She did not ask anyone's permission. She just did it. Ms. Cameron testified that she had planned to return to her mother's home

to get the rest of the stuff but was not able to do so because Ms. Woods changed the locks.

*   *   *

Further, it . . . strikes the court as odd or raises "red flags" when a person, here Ms. Cameron, pleads the Fifth when she is asked the name and address of the storage facility where the items are stored. She said in Cartersville, Georgia. She gave very little other information about such. One can also wonder why the personal property was moved to Cartersville, where Ms. Cameron and [her fiancée] live, instead of being stored in Chattanooga.

*   *   *

Initially, Ms. McQuinn was not happy at The Bridge. That feeling changed in time. She had made friends. She has activities. She and the staff appear to have bonded. She did not want to leave the nursing home. She did not talk about her home or possessions. She seemed quite content where she was living. The court did not find true Ms. Cameron's allegations that her mother was chemically restrained, over medicated, and subject to undue influence by staff as a way of damaging the mother-daughter relationship or keeping Ms. McQuinn at The Bridge against her will.

Ms. Cameron and Mr. Gray live in Cartersville, Georgia, which is approximately halfway between his job in Dekalb County, Georgia and her job in Chattanooga. Ms. Cameron is also a part-time student at Georgia Northwestern Technical College in Rock Spring, Georgia. Ms. Cameron said she would move in with her mother at her mother's home. Due to her job, she would have to have other people assist in caring for her mother. Ms. Green did not think such an arrangement was feasible due to Ms. McQuinn's medical and mental condition.

*   *   *

11

Ms. McQuinn said on several occasions that "I love Jackie [Cameron]." However, she did not want Ms. Cameron to be her conservator. In the court's opinion, based upon the emotion with which Ms. McQuinn spoke, the appointment of Ms. Cameron as conservator would not be in Ms. McQuinn's best interest. The court is to make the decision at conservator in Ms. McQuinn's best interest. The court has concluded that it is not in Ms. McQuinn's best interest to appoint Ms. Cameron as conservator for the reasons stated herein.

The court's opinion is based not only upon Ms. McQuinn's own feelings and desires but the court's concerns about Ms. Cameron's judgment and how far she went to get her own way. She accused the staff of using chemical restraints and overmedicating Ms. McQuinn to keep her at The Bridge because the more people who reside there, the more money the facility receives from the State of Tennessee. She also accused the staff of using undue influence to turn Ms. McQuinn against Ms. Cameron.

Based upon our review of the transcript of the hearing, the evidence in the record fully supports these findings made by the trial court.

Finally, the trial court stated as follows regarding its decision to assess attorney's fees and costs of the attorney ad litem and the guardian ad litem:

When Ms. Cameron became emergency conservator, the court was required to appoint an attorney ad litem to represent Ms. McQuinn in this case. Tennessee Code Annotated § 34-1-132(a) (Supp. 2013). Further, Tenn. Code Ann. § 34-1-125 provides as follows:

**Attorney ad litem.** - (a) The court shall appoint an attorney ad litem to represent the respondent on the respondent's request, upon the recommendation of the guardian ad litem or if it appears to the court to be necessary to protect the rights or interests of the respondent. The attorney ad litem shall be an advocate for the respondent in resisting the requested relief.

12

> (b) The cost of the attorney ad litem shall be charged against the assets of the respondent.

According to subsection (b), the costs of the attorney ad litem must be charged against and paid from the assets of Ms. McQuinn.

*     *     *

The only reason [attorney ad litem] Tepley was appointed was due to Ms. Cameron's appointment as emergency conservator. His fees, by statute, have to be charged against Ms. McQuinn's assets. Here, the court finds that the costs of the guardian ad litem should be charged to Ms. Cameron. The Bridge was relying on Ms. Ford, as attorney in fact for Ms. McQuinn, for advice and direction. It can be inferred that the principal purpose of the proceeding was to benefit Ms. Cameron. She, while the case was proceeding, removed almost all of Ms. McQuinn's property from the home. One can argue that the conservatorship petition was not necessary due to the existence of the power of attorney document and Ms. Ford's service.

Therefore, the court sets Ms. Woods' fee and expense at $8,027.43 and assess[es them] against Ms. Cameron.

(Bold print in original.)

As the trial court correctly noted, an award of the guardian ad litem's fees and costs in a conservatorship action is governed by Tenn. Code Ann. § 34-1-114 (Supp. 2014), which provides,

> (a) The costs of the proceedings, which are the court costs, the guardian ad litem fee and expenses incurred by the guardian ad litem in conducting the required investigations, the required medical examination costs, and the attorney's fee for the petitioner, *may, in the court's discretion*, be charged against the property of the respondent to the extent the respondent's property exceeds the supplemental security income eligibility limit, *or to the petitioner* or any other party, or partially to any one or more of them *as determined in the*

*court's discretion.* In exercising its discretion to charge some or all of the costs against the respondent's property, the fact a conservator is appointed or would have been appointed but for an event beyond the petitioner's control is to be given special consideration. The guardian ad litem fee and the attorney's fee for the petitioner shall be established by the court. If a fiduciary is cited for failure to file an inventory or accounting, the costs incurred in citing the fiduciary, in the discretion of the court, may be charged to and collected from the cited fiduciary.

(b) If the principal purpose for bringing the petition is to benefit the petitioner and there would otherwise be little, if any, need for the appointment of a fiduciary, the costs of the proceedings may be assessed against the petitioner, in the discretion of the court.

(Emphasis added.) In 2013, the General Assembly amended this statute, deleting the former version in its entirety and rewriting the statute to, among other things, provide the trial court a greater measure of discretion in assessing guardian ad litem fees.[2] As can be seen from the plain language of the statute, it clearly accords the trial court discretion to award the fees and expenses of the guardian ad litem against the petitioner. We hold that the trial court did not abuse its discretion in its award of guardian ad litem fees and expenses.

Regarding the trial court's order that Cameron return the items of personal property taken by her and her fiancée from McQuinn's house, Cameron admitted that she knowingly took the items after her appointment as emergency conservator had been revoked. She maintained that all of the personal property belonged to her mother and she

---

[2] The former version of Tenn. Code Ann. § 34-1-114 (2007) provided:

> (a) If a fiduciary is appointed, the costs of the proceedings, which are the court costs, the guardian ad litem fee, the required medical examination costs and the attorney's fee for the petitioner, shall be charged against the property of the respondent to the extent the respondent's property exceeds the supplemental security income eligibility limit. If no fiduciary is appointed, the costs of the proceedings shall be charged against the petitioner. The guardian ad litem fee and the attorney's fee for the petitioner shall be established by the court. If a fiduciary is cited for failure to file an inventory or accounting, the costs incurred in citing the fiduciary, in the discretion of the court, may be charged to and collected from the cited fiduciary.

took it for safekeeping.  Obviously, it is now part of McQuinn's estate.  We find no error in the trial court's judgment ordering Cameron to return the personal property to McQuinn's home.

The evidence does not preponderate against the trial court's findings of fact.  Furthermore, we hold that the trial court did not abuse its discretion when it made its various discretionary rulings in this case.

V.

The trial court's judgment is affirmed.  Costs on appeal are assessed to the appellant, Jacqueline D. Cameron.  This case is remanded to the trial court for such further action as may be required consistent with this opinion.

_____
CHARLES D. SUSANO, JR., CHIEF JUDGE